UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| CHRISTINA CAIN, DARRON DANNA, STEPHANIE YOUNGBLOOD, JOSHUA WOLF, KIM WHITE, BRANDON GUERRA, and CHARLES WILLIAMS, on behalf of themselves, and all others similarly situated,<br>Plaintiffs,<br>v.<br>CGM, L.L.C. d/b/a CGM, INC.,<br>Defendant. | CIVIL ACTION NO.<br>1:23-CV-02604-SEG |

**ORDER**

This case is before the Court on Plaintiffs' Unopposed Motion for Final Approval of Class Action Settlement, (Doc. 69), Plaintiffs' Motion for Attorneys' Fees and Expenses, (Doc. 62), and Plaintiffs' Motion for Class Representatives' Service Awards. (Doc. 63.)

## I. Background

### A. Relevant Facts and Procedural History

This is a data breach class action. The complaint alleges that between December 15, 2022, and December 28, 2022, Defendant CGM experienced a cyberattack, in which unauthorized third parties accessed files on CGM's

network systems (the "Data Incident"). (Doc. 29 ¶ 1.) The personal data allegedly compromised in this breach included CGM's customers' names, Social Security numbers, and driver's license or state ID numbers. (*Id.*)

On June 10, 2023, Plaintiff Christina Cain filed this lawsuit as a putative class action. (Doc. 1.) Six additional putative class actions were subsequently filed in response to the subject Data Incident. On August 22, 2023, the Court granted Plaintiffs' motion to consolidate these cases with the instant case before the Court. (Doc. 25.) On September 27, 2023, Plaintiffs filed a consolidated class action complaint. (Doc. 29.) The consolidated complaint asserted eight claims: (1) negligence, (2) negligence *per se*, (3) breach of implied contract, (4) breach of contract – third party beneficiary, (5) unjust enrichment, (6) invasion of privacy – intrusion into private affairs, (7) violation of the California Consumer Privacy Act of 2018, Cal. Civ. Code §§ 1798.100, *et seq*. ("CCPA"), and (8) violation of California's Consumer Records Act, Cal. Civ. Code §§ 1798.82, *et seq*. ("CCRA"). (*Id.* ¶¶ 129–251.)

On November 2, 2023, the Court granted the parties' joint motion to stay pending mediation. (Doc. 46.) On December 19, 2023, the parties participated in mediation before the Honorable J. Elizabeth McBath. (Doc. 47.) The case did not settle at that juncture, but the parties continued their negotiations and

ultimately reached an agreement. Plaintiffs then filed an unopposed motion for preliminary approval of the parties' class action settlement. (Doc. 56.)

The Court held a hearing on Plaintiffs' motion for preliminary approval of the settlement, during which it directed the parties to make certain revisions to clarify aspects of the notice and claims forms. After the parties did so, (Doc. 59), the Court then granted the motion for preliminary approval. (Doc. 61.) The Court's preliminary approval order provisionally certified the following settlement class (the "Settlement Class"):

> All persons who were notified that their personal data may have been impacted as a result of CGM's Data Incident that occurred from approximately December 15, 2022, to December 28, 2022.

(*Id.* ¶ 2.)[1] The Court set a schedule for class notice, the filing of Plaintiffs' attorneys' fee petition, and deadlines for opting out of the settlement agreement, submitting claims, and submitting objections. (*Id.* at 16.) Pursuant to the court-approved schedule, Plaintiffs' counsel were required to file their fee petition before the objection deadline. (*Id.*)

---

[1] The Court excluded from the Settlement Class: (1) CGM's officers and directors; (2) all Settlement Class members who timely and validly request exclusion from the Settlement Class; (3) the Judges assigned to the litigation and to evaluate the fairness, reasonableness, and adequacy of this settlement; and (4) any other person found by a court of competent jurisdiction to be guilty under criminal law of perpetrating, aiding or abetting the criminal activity resulting in the Data Incident or who pled *nolo contendere* to any such charge. (*Id.* ¶ 3.)

Plaintiffs have now filed unopposed motions for final approval of the parties' class action settlement agreement, attorneys' fees and expenses, and class representatives' service awards. (Docs. 62, 63, 69.) The Court held a hearing on these motions on August 26, 2024. Class members were given the opportunity to attend by video teleconference, and a Zoom link to the hearing was provided on the docket.

**B. Terms of the Settlement Agreement**

The parties have negotiated a common fund settlement of $1,500,000, (Doc. 56-2 at 5), to be used for the payment of claims, attorneys' fees and expenses, service awards for class representatives, and settlement administration costs. (*Id.,* Settlement Agreement § 3.1.)

The Settlement Agreement provides two types of benefits to class members. First, class members may sign up for three years of free credit monitoring and theft protection services from all three credit bureaus, which includes at least $1,000,000 of identity theft and fraud insurance. (*Id.,* Settlement Agreement § 3.1.2.)

Second, class members may claim money damages. Class members have two options in claiming money damages. The first option ties the amount of the payment to the harm that befell the particular class member due to the

Data Incident. Under this option, a class member may be reimbursed, subject to proper documentation, for the following losses:

1. Lost time spent reasonably related to the Data Incident, such as time spent mitigating the harms of the breach. (*Id.,* Settlement Agreement § 3.1.3.) Class members may claim up to four hours at $20 per hour. (*Id.* at 5.)
2. Ordinary losses, which include, among other things, expenses like bank fees, long distance phone charges, postage, mileage, and fees for credit reports and monitoring. (*Id.,* Settlement Agreement § 3.1.4.) Class members may claim up to $400 for such losses. (*Id.* at 5.)
3. Extraordinary expenses, which include unreimbursed costs and expenses fairly traceable to the Data Incident, such as falsified tax returns. (*Id.,* Settlement Agreement § 3.1.5.) Class members may claim up to $4,000 for these losses. (*Id.* at 5.)

Instead of these reimbursements, class members may elect to receive a cash payment. Under this option, the amount the claimants receive will increase or decrease depending on the amount claimed by other class members as well as the number of claimants that opt for this alternative cash payment. (*Id.,* Settlement Agreement § 3.1.6.)

To ensure that the settlement fund is completely disbursed without reversion to Defendant, the Settlement Agreement provides that any remaining funds (*e.g.,* funds from uncashed checks) will be disbursed in a *cy pres* payment. (*Id.,* Settlement Agreement § 3.1.7.) In other words, there is no possibility that any of the $1,500,000 in the common fund will revert to Defendant.

The Settlement Agreement contains a release provision. (*Id.,* Settlement Agreement § 5.) Under this provision, class members who do not opt out from the Settlement Agreement will release the claims that they asserted or could have asserted in this lawsuit against Defendant. (*Id.*) Thus, the release applies only to claims related to the underlying Data Incident.

The parties further negotiated attorneys' fees, costs, and service awards for Plaintiffs in connection with the Settlement Agreement. Specifically, Defendant has agreed to pay, subject to Court approval, $500,000 in attorneys' fees and expenses, drawn from the $1,500,000 settlement common fund. (*Id.* at 5.) Defendant has also agreed to pay, subject to Court approval, $11,500 in service awards to the named Plaintiffs.[2] (*Id.*)

[2] The proposed service award would pay $2,500 to Plaintiff Christina Cain, and $1,500 to the other named Plaintiffs. (*Id.*)

**C. Class Notice and Class Members' Response to Notice**

In its preliminary approval order, the Court approved Kroll Settlement Administration ("Kroll") as the Claims Administrator in this case. (Doc. 61 ¶ 13.) Scott Fenwick, a senior director with Kroll, has submitted a declaration detailing the firm's efforts in notifying class members and administering claims. (Doc. 69-2, Fenwick Decl.) On May 1, 2024, Kroll received data files from Defendant from which it identified the names and addresses of 314,857 class members. (*Id.* ¶ 7.) On May 28, 2024, Summary Notices were mailed via first-class mail to the 314,857 class members. (*Id.* ¶ 9.) The Summary Notices contained information regarding settlement benefits, the amount of requested attorneys' fees, the final approval hearing, and the deadlines for claim submissions, objections, and opt-out requests. (*Id.*, Ex. C.) After initially mailing the Summary Notices, Kroll took steps to re-mail any notices that were returned as undeliverable or as containing a forwarding address. (*Id.* ¶¶ 9-11.) Kroll estimates a "reach rate" — the percentage of class members who received direct mail notice — of 93.7 percent. (*Id.* ¶ 12.)

In a further effort to educate class members about the settlement, Kroll established a toll-free telephone hotline for class members who might have questions about the proposed settlement. (*Id.* ¶ 6.) As of August 9, 2024, the hotline received 9,155 calls. (*Id.*) On May 28, 2024, a dedicated settlement

website — www.cgmsettlementsupport.com — "went live," allowing class members to obtain information about the settlement and download copies of "the Settlement Agreement, the Preliminary Approval Order, the Detailed Notice, [and] the Claim Form . . . ." (*Id.* ¶ 8.) Additionally, the website included contact information for the Settlement Administrator, answers to frequently asked questions, and important dates and deadlines. (*Id.*) It also allowed class members an opportunity to file a claim form online. (*Id.*)

As of the opt-out deadline, Kroll received five requests to opt out of the settlement. (*Id.* ¶¶ 13–14.) Additionally, one class member objected to the settlement. (Doc. 66.) As of the August 26, 2024, deadline to submit claims, Kroll received 2,653 claims, which collectively contained 644 requests for reimbursement for lost time, for a total of $574,861.80; 644 requests for credit monitoring services, for a total of $12,055.68; 285 requests for ordinary expenses, for a total of $103,462.67; 274 requests for extraordinary expenses, for a total of $922,132.77; and 1,688 requests for alternative cash payments. (Doc. 77 at 1–2.)

**D. Deficiency Process and Total Distributions**

As per the Settlement Agreement, Kroll was required to determine which claims, if any, were deficient. (Doc. 56-2, Settlement Agreement §§ 4.2–4.3.) Claims were deemed deficient for several reasons. (Doc. 79 at 3.) An

extraordinary loss claim, for example, was determined to be deficient when the claimant failed to provide supporting documentation. (*Id.*) And a lost time claim was deemed deficient when a claimant failed to provide either "[h]ours [l]ost" or a "[t]ime [d]escription." (*Id.*) As part of the deficiency process, Kroll sent letters to class members who filed deficient claims and allowed those individuals an opportunity to supplement their claims. (*Id.*) The deficiency process resulted in a lowering of the amount claimed for each category of loss because several deficient claims were not cured. (*Id.*)

After completion of the deficiency determination process, Kroll approved: (1) 533 claims for lost time, for a total of $36,214; (2) 1,501 claims for credit monitoring, for a total of $14,049.36; (3) six claims for ordinary expenses, for a total of $1,529.81; (4) one claim for extraordinary expenses, for a total of $8.00; and (5) 1,650 claims for alternative cash payments, for a total of $664,085.67. (*Id.* at 4.)

The alternative cash payment amount was determined by calculating the net settlement fund amount remaining after deductions for: (1) attorneys' fees and expenses; (2) service awards; (3) settlement administration costs; and (4) class members' claims for lost time, ordinary losses, extraordinary losses, and credit monitoring. (*Id.*) After making these deductions, the net settlement fund amount remaining for alternative cash payments was $664,085.67.

Distributed across 1,650 claims, the alternative cash payment is thus approximately $402.48 per person. (*Id.*)

## II. Discussion

### A. Notice to the Class Complied with Rule 23(c)(2) and the Requirements of Due Process

The Court first considers the sufficiency of the notice provided to absent class members. Rule 23(c)(2) "prescribes the notice a class action court must direct to the class proposed to be certified[,]" and is designed to "fulfill the fundamental requirements of due process." *Drazen v. Pinto*, 106 F.4th 1302, 1335 (11th Cir. 2024). Relevant here, Rule 23(c)(2) provides that:

> [T]he court must direct to class members the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort. The notice may be by one or more of the following: United States mail, electronic means, or other appropriate means. The notice must clearly and concisely state in plain, easily understood language:
> (i) the nature of the action;
> (ii) the definition of the class certified;
> (iii) the class claims, issues, or defenses;
> (iv) that a class member may enter an appearance through an attorney if the member so desires;
> (v) that the court will exclude from the class any member who requests exclusion;
> (vi) the time and manner for requesting exclusion; and
> (vii) the binding effect of a class judgment on members under Rule 23(c)(3).

Fed. R. Civ. P. 23(c)(2)(B).

"In reviewing the class notice to determine whether it satisfies these requirements, "[courts] look solely to the language of the notices and the manner of their distribution." *Adams v. S. Farm Bureau Life Ins. Co.*, 493 F.3d 1276, 1286 (11th Cir. 2007). As to how notice is distributed, "[i]ndividual notice must be sent to all class members whose names and addresses may be ascertained through *reasonable* effort," *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 173 (1974) (emphasis added), but "even in Rule 23(b)(3) class actions, due process does not require that class members actually receive notice." *Juris v. Inamed Corp.*, 685 F.3d 1294, 1321 (11th Cir. 2012). Reasonableness is "a function of anticipated results, costs, and amount involved." *In re Nissan Motor Corp. Antitrust Litig.*, 552 F.2d 1088, 1099 (5th Cir. 1977). The notice should also contain an adequate description of the proceedings written in "objective, neutral terms, that, insofar as possible, may be understood by the average absentee class member." *Id.* at 1104.

The Court first addresses the method of providing notice. In this case, Kroll, a firm that has "provided notification and/or claims administration services in more than 3,000 cases," was designated as the Settlement Administrator. (Doc. 69-2, Fenwick Decl. ¶ 2.) After receiving data from Defendant, Kroll identified the names and addresses of 314,857 class members. (*Id.* ¶ 7.) In accordance with the Court's preliminary approval order, (Doc. 61),

Kroll mailed Summary Notices, (Doc. 69-2, Ex. C), to all identified class members. (Doc. 69-2, Fenwick Decl. ¶ 9.) It also designated a post office box "to receive opt out requests, [c]laim [f]orms, objections, and correspondence from [c]lass [m]embers." (*Id.* ¶ 5.) After mailing the Summary Notices, Kroll took steps to re-mail any notices that were returned as undeliverable by conducting advanced address searches. (*Id.* ¶¶ 9–11.) In addition, it established a toll-free phone number and website for members to obtain further information about the lawsuit. (*Id.* ¶¶ 6, 8.) Using these methods, Kroll achieved an impressive estimated "reach rate" of 93.7 percent. (Doc. 69-2, Fenwick Decl. ¶ 12.) The Court finds that the manner in which notice was sent to class members met the requirements of Rule 23(c)(2).

The Court next addresses the content of the notice. The Summary Notice provided class members with a description of the nature of the lawsuit; information about settlement benefits, including claimants' potential eligibility for identity theft protection services and damages; notice as to the timeframe and manner for submitting a claim; notice of class members' options and their consequences (*i.e.*, that class members could take no action, submit a claim form, object to the settlement, or opt out of the settlement, but that only opting out would preserve their right to bring suit); notice as to the attorneys' fee request; and notice of the timing and location of the Court's final

approval hearing. (*Id.,* Ex. C.) The Summary Notice also included a link to a website with additional information about the settlement. (*Id.,* Ex. C.) The website included copies of a "Detailed Notice," (*id*., Fenwick Decl. ¶ 8), which informed class members, *inter alia*, that they could, at their own expense, hire their own lawyer to represent them in this matter. (*Id.,* Ex. D.) The website also included a copy of the Settlement Agreement, (*id*., Fenwick Decl. ¶ 8), which defined the certified class. (Doc. 56-2 at 2.)

The Court finds that the content of the notice documents satisfied Rule 23(c)(2). In plain, easily understandable language, the Summary Notice described the proceedings, explained the settlement benefits, and set forth class members' options. It also directed class members to a website with further information about the lawsuit. Together, the notice documents provided class members with all the information required by Rule 23(c).[3]

Based on the foregoing, the Court finds that the notice provided to class members was the best notice practicable under the circumstances in satisfaction of Rule 23(c)(2).

[3] Notice was also properly provided, pursuant to the Class Action Fairness Act, 28 U.S.C. § 1715(b) ("CAFA"), to the Attorney General of United States and the state and territorial Attorneys General identified in the service list for CAFA. (Doc. 69-2, Fenwick Decl. ¶ 4.)

### B. The Settlement is Fair, Reasonable, and Adequate Under Rule 23(e) and the *Bennett* Factors

In evaluating whether to approve a proposed class settlement, the district court "acts as a fiduciary who must serve as a guardian of the rights of absent class members." *Drazen*, 106 F.4th at 1328 (quotation marks omitted). The Court must "exercise careful scrutiny in order to guard against settlements that may benefit the class representatives or their attorneys at the expense of absent class members." *In re Equifax Inc. Customer Data Sec. Breach Litig.*, 999 F.3d 1247, 1265 (11th Cir. 2021) (quotation marks omitted).

The Court's consideration of the instant motion for final settlement approval is governed by Rule 23(e)(2), which provides as follows:

> If the proposal would bind class members, the court may approve it only after a hearing and only on finding that it is fair, reasonable, and adequate after considering whether:
>
> (A) the class representatives and class counsel have adequately represented the class;
> (B) the proposal was negotiated at arm's length;
> (C) the relief provided for the class is adequate, taking into account:
>> (i) the costs, risks, and delay of trial and appeal;
>> (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;
>> (iii) the terms of any proposed award of attorney's fees, including timing of payment; and
>> (iv) any agreement required to be identified under Rule 23(e)(3); and

> (D) the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2). Rule 23(e)(2) thus sets forth four "core concerns of procedure and substance that should guide the decision whether to approve the proposal." *Ponzio v. Pinon*, 87 F.4th 487, 495 (11th Cir. 2023). As explained below, consideration of each Rule 23(e)(2) factor supports a finding that the settlement is fair, reasonable, and adequate.

**1. The Class Members Were Adequately Represented**

The Court finds that the class representatives and class counsel have adequately represented the class in accordance with Rule 23(e)(2)(A).

First, the named Plaintiffs do not have any conflict with the proposed class. The named Plaintiffs, like putative class members, had their personal data compromised because of the Data Incident. Plaintiffs' claims are thus typical of and not antagonistic to the absent class members' claims. Plaintiffs, moreover, have moved this case to successful resolution with significant benefits to the class. Plaintiffs have assisted class counsel by providing documents, reviewing pleadings, remaining available for consultation throughout the litigation and mediation, and reviewing the Settlement Agreement. (Doc. 69-3, Pl. Counsel Decl. ¶ 23.)

Second, class counsel are experienced in class action litigation and capably represented the class throughout this case. Class counsel investigated the facts and claims; researched and developed the pertinent legal issues, relying in part on their experience in other data breach class actions; communicated with clients; drafted the complaint; facilitated the consolidation of the named Plaintiffs' cases; represented Plaintiffs in mediation and post-mediation negotiations; participated in drafting the Settlement Agreement; worked with the claims administrator in facilitating a successful class member notice program; prepared filings in support of preliminary approval of the settlement; prepared filings in support of final approval of the settlement; and represented class members at the August 26, 2024, hearing on Plaintiffs' motion for final approval of the Settlement Agreement. The requirements of Rule 23(e)(2)(A) are fully satisfied.

**2. The Settlement was Negotiated at Arm's Length**

The second core concern of Rule 23(e)(2) — whether the settlement was negotiated at arm's length — is also satisfied. The case was vigorously litigated prior to mediation. The parties then participated in mediation conducted by a Magistrate Judge of this Court. *See Ingram v. The Coca-Cola Co.*, 200 F.R.D. 685, 693 (N.D. Ga. 2001) ("The fact that the entire mediation was conducted under the auspices of . . . a highly experienced mediator, lends

further support to the absence of collusion."). When the case did not settle at mediation, the parties continued to negotiate until mutually agreeable terms were reached. Additionally, the parties did not negotiate attorneys' fees, costs, expenses, or service awards until after the substantive terms of the settlement had been decided. (Doc. 69-1 at 4-5.) The procedural history of the case suggests an arm's length, non-collusive process.

The settlement terms further suggest that the parties negotiated at arm's length and that Plaintiffs centered the interests of absent class members in their negotiations. This is decidedly not a case in which the settlement benefits the class representatives or their attorneys at the expense of absent class members. On the contrary, the Settlement Agreement provides immediate and significant financial benefits to absent class members.

In keeping with its role as a fiduciary, this Court has closely scrutinized both the parties' path to a negotiated resolution and the settlement terms. Having done so, the Court finds that the settlement is not the product of collusion. *See Drazen*, 106 F.4th at 1328.

**3. The Relief Provided to the Class is Adequate**

As previously discussed, the Settlement Agreement provides monetary relief to persons injured by the Data Incident. It is structured to provide that relief in proportion to the injury experienced by each class member. The

settlement provides reimbursement for time spent responding to problems caused by the Data Incident, reimbursement for out-of-pocket expenses, or sizeable alternative cash payments. (Doc. 79 at 4.) It also provides for three years of free credit monitoring and identity theft protection services for 1,501 claimants. (*Id.*)

Taking into account the considerations set forth in Rule 23(e)(2)(C)(i)−(iv), the Court finds that the relief provided to the class is more than adequate. This is especially so when considering the costs, risks, and delays associated with trial and a possible appeal. *See* Rule 23(e)(2)(C)(i). At the time settlement was reached, this case was still at the pleading stage. The settlement avoids a lengthy discovery process and other delays to relief occasioned by ongoing litigation. Considering the evolving nature of the caselaw in this area, the settlement avoids the possibility of class members recovering no relief at all.

As for the proposed method of distributing relief, *see* Fed. R. Civ. P. 23(e)(2)(C)(ii), the Court has reviewed the claim, deficiency, and payment distribution procedures and finds them fair and reasonable. *See Williams v. Reckitt Benckiser LLC*, 65 F.4th 1243, 1250, 1261 (11th Cir. 2023) (quoting Rule 23(e)(2)(C)(ii) and emphasizing that the district court must scrutinize "the effectiveness" of the settlement's "method of distributing relief to the class").

Any class member who submitted an allegedly deficient claim was given an opportunity to cure the deficiency. (Doc. 56-2 at 7.) Further, the Settlement Agreement requires that payments to plaintiffs must be made promptly following final settlement approval. (*See id.*) More specifically, the Settlement Administrator will mail checks to class members within approximately 90 days after the entry of this order. (*See* Doc. 56-2 at 7, 12.) The settlement thus provides for an orderly and timely method of distributing payment.

As for the terms of the proposed attorneys' fee award and timing of the attorneys' fee payment, *see* Fed. R. Civ. P. 23(e)(2)(C)(iii), the requested attorneys' fees are fair and reasonable under applicable legal standards, as discussed below. Further, the timing of the payment of fees does not impact the adequacy of the relief, as no fees will be paid until after Defendant fully funds the settlement, and under no circumstance will any of the settlement funds revert to Defendant.

Finally, the Settlement Agreement and its attachments are the only agreements impacting the settlement of this case. There are no side agreements required to be identified under Rule 23(e)(2)(C)(iv).

#### 4. Class Members are Treated Equitably Relative to Each Other

The Court further finds that the Settlement Agreement treats class members equitably relative to each other in accordance with Rule 23(e)(2)(D). While class members may be compensated in different amounts, those differences merely reflect that some class members have been harmed more than others. And all class members, regardless of their losses, are entitled to a sizeable alternative cash payment and credit monitoring services.

One issue that sometimes arises in the context of Rule 23(e)(2)(D) is whether "the scope of the release may affect class members in different ways that bear on the apportionment of relief." Fed. R. Civ. P. 23(e)(2) Adv. Comm. Notes (2018). That problem is not present here. The release in this case is tailored to the claims that have been pleaded or could have been pleaded against Defendant in connection with the Data Incident. (Doc. 56-2 at 4.) All class members have similar claims arising from the same event and are thus treated equitably under the terms of the release. Although some class members may be entitled to more damages than others, the scope of the release has no effect on the apportionment of relief in this case.

For the foregoing reasons, the Court finds that the settlement is fair, adequate, and reasonable in satisfaction of the requirements of Rule 23(e)(2).

### 5. The Settlement is Fair, Adequate, and Reasonable Under the *Bennett* Factors

In addition to the Rule 23(e)(2) factors, the Eleventh Circuit has instructed district courts to consider the factors in *Bennett v. Behring Corp.*, 737 F.2d 982 (11th Cir. 1984), when evaluating a proposed class settlement. *Drazen*, 106 F.4th at 1330. These factors are:

> (1) the likelihood of success at trial; (2) the range of possible recovery; (3) the point on or below the range of possible recovery at which a settlement is fair, adequate and reasonable; (4) the complexity, expense and duration of litigation; (5) the substance and amount of opposition to the settlement; and (6) the stage of proceedings at which the settlement was achieved.

*Bennett*, 737 F.2d at 986. "The four core concerns set out in Rule 23(e)(2) provide the primary considerations in evaluating proposed agreements," but "the *Bennett* factors can, where appropriate, complement those core concerns." *Ponzio*, 87 F.4th at 495.

The *Bennett* factors collectively support a finding that the settlement is fair, adequate, and reasonable. As applied here, the first four factors overlap. Plaintiffs' success at trial in this case is by no means guaranteed. The legal issues presented fall within the evolving legal landscape of data and consumer privacy caselaw. *See, e.g., In re Arby's Rest. Grp., Inc. Data Sec. Litig.*, No. 1:17-CV-1035-WMR, 2019 WL 2720818, at *3 (N.D. Ga. June 6, 2019) (stating that "data breach litigation involves the application of unsettled law with

disparate outcomes across states and circuits"). And, as Plaintiffs note, Defendant would have "a number of potentially case-dispositive defenses" available to it if this case proceeded. (Doc. 69-1 at 11.) Without the settlement, it is possible that class members would obtain no recovery. It is, of course, possible that Plaintiffs could achieve a more favorable outcome following a trial than under the settlement terms. But that prospect is unlikely given Defendant's limited financial resources. (*See* Doc. 56-1 at 7, 10.) And, such a result, if it occurred at all, would only be reached after years of resource-intensive litigation. Instead, settlement will provide class members with a guaranteed, immediate financial benefit to compensate them for losses resulting from the Data Incident.

Under the fifth *Bennett* factor, the Court considers that *only one* out of 314,857 class members objected to the settlement, and the sole objection (as discussed below) in no way impugns the Settlement Agreement's overall fairness, reasonableness, and adequacy. This factor weighs in favor of approving the settlement.

Finally, the Court considers the stage in the case at which the settlement was reached. Although settlement was negotiated relatively early in the litigation, the record supports a finding that Plaintiffs had access to sufficient

information to evaluate the merits of the case and weigh the benefits of settlement against the risks of continued litigation.

In sum, all six *Bennett* factors support the conclusion that the settlement is fair, adequate, and reasonable.

**6. The Court Overrules the Single Objection to the Settlement Agreement**

One class member, Mr. Trevor Jackson, has objected to the settlement agreement. An objector to a proposed class settlement must "state with specificity the grounds for the objection." Fed. R. Civ. P. 23(e)(5)(A). "This means that objections 'must provide sufficient specifics to enable the parties to respond to them and the court to evaluate them.'" *Ponzio*, 87 F.4th at 500 (quoting Fed. R. Civ. P. 23(e)(5)(A), Advisory Committee's Note to 2018 Amendment).

Mr. Jackson objects on the ground that the maximum damages allowed under the settlement are not sufficient to compensate him for the injury he experienced. Mr. Jackson states that "bad actors used the data exfiltrated from CGM[ ] to continue to subject [him] to a, hate-based, stalking, harassment, and intimidation campaign with politically extremist motivations." (Doc. 66 at 2.) Mr. Jackson also references the fact that he made a suicide attempt in December 2023 that he links to the insecurity of data on his phone. (*Id.*)

While the Court is sympathetic to Mr. Jackson's difficult circumstances, the concerns described in his objection do not prevent final approval of the settlement. The specifics of the causal link between the data breach and Mr. Jackson's mental health circumstances are not apparent from the written objection. And even if the link was more clearly established, Mr. Jackson's alleged injuries appear to be atypical of those of the class. *See* Manual for Complex Litigation, § 21.643 (4th ed., May 2023 Update) ("Unless a number of class members raise similar objections, individual objectors rarely provide much information about the overall reasonableness of the settlement."). Ultimately, the Court finds that Mr. Jackson's unique circumstances do not support a valid objection to the overall reasonableness of the settlement. The objection is overruled.

In sum, the Court finds that the Settlement Agreement is fair, reasonable, and adequate, in satisfaction of Rule 23(e)(2).

### C. The Court Certifies the Settlement Class

Next, the Court examines whether the proposed settlement class may be certified under the prerequisites of Rule 23(a) and Rule 23(b)(3). *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 613–14 (1997). Class certification is proper when the proposed class meets all requirements of Rule 23(a) and one or more subsections of Rule 23(b). Rule 23(a) requires (1) numerosity, (2)

commonality, (3) typicality, and (4) adequacy of representation. *See* Fed. R. Civ. P. 23(a)(1)−(4). Rule 23(b)(3) requires that (1) "the questions of law or fact common to class members predominate over any questions affecting only individual members," and that (2) "a class action [be] superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

In its preliminary approval order, the Court provisionally certified for purposes of settlement the following Settlement Class:

> All persons who were notified that their personal data may have been impacted as a result of CGM's Data Incident that occurred from approximately December 15, 2022, to December 28, 2022.

(Doc. 61 at 5.)

In that order, the Court also addressed the relevant certification factors and explained that they were satisfied in this case. (Doc. 61.) The Court reaffirms here that the prerequisites of Rule 23(a) and (b)(3) have been satisfied for settlement purposes.

First, the settlement class of 314,857 members is so numerous that joinder is impracticable. Second, the lawsuit involves claims common to each member of the settlement class, and the claims are subject to common forms of proof. Third, the claims of class representatives are typical of the claims of absent class members because named plaintiffs have experienced the same

kind of data-breach injury as absent class members. Fourth, the adequacy requirement is satisfied given that Plaintiffs "face the same risk of identity theft" and other harms stemming from the Data Incident, seek the "same compensatory damages for that injury[,]" and "all receive the same benefits to redress that shared injury." *In re Equifax Inc. Customer Data Sec. Breach Litig.*, 999 F.3d 1247, 1277 (11th Cir. 2021) (finding the adequacy requirement of Rule 23(a)(4) satisfied in a data breach case). Fifth, common questions of law and fact predominate over questions affecting only individual class members. And sixth, given the relatively small, individual damages at issue, a class action and class settlement are far superior to other available methods for a fair and efficient resolution of this controversy.

**D. Attorneys' Fees and Costs**

Under Rule 23(h), a trial court may award reasonable attorneys' fees and nontaxable costs that are authorized by law or by the parties' agreement. Fed. R. Civ. P. 23(h). "[A] district court 'has great latitude in formulating attorney's fees awards subject only to the necessity of explaining its reasoning . . . .'" *Waters v. Int'l Precious Metals Corp.*, 190 F.3d 1291, 1293 (11th Cir. 1999) (citing *McKenzie v. Cooper, Levins & Pastko, Inc.,* 990 F.2d 1183, 1184 (11th Cir. 1993)).

In a case in which the settlement establishes a common fund, attorneys' fees are based upon a reasonable percentage of the fund established for the benefit of the class. *See Drazen*, 106 F.4th at 1339; *Camden I Condo Ass'n, Inc. v. Dunkle*, 946 F.2d 768, 774 (11th Cir. 1991). "A court has substantial discretion in determining the appropriate fee percentage." *Elder v. Reliance Worldwide Corp.*, No. 1:20-CV-1596-AT, 2025 WL 354513, at 4 (N.D. Ga. Jan. 28, 2025). Although "[t]he majority of common fund fee awards fall between 20% to 30% of the fund[,]" *Camden I*, 946 F.2d at 774, "[a]wards of up to 33% of the common fund are not uncommon in the Eleventh Circuit, and especially in cases where Class Counsel assumed substantial risk by taking complex cases on a contingency basis." *In re Arby's Rest. Grp., Inc. Data Sec. Litig.*, No. 1:17-CV-1035-WMR, 2019 WL 2720818, at *4 (N.D. Ga. June 6, 2019).

Here, Defendant has agreed to pay $1,500,000 into a common fund. From this common fund, counsel request $500,000 in attorneys' fees and costs. (*See* Doc. 62-2, Toops Decl. ¶¶ 8, 11). The percentage of fees requested in this case (33%) falls well within the range awarded in other cases in this district. *See Lunsford v. Woodforest Nat'l Bank*, No. 1:12-CV-103-CAP, 2014 WL 12740375, at *15 (N.D. Ga. May 19, 2014) (collecting cases that have determined a "one-third fee is well within the range of a customary fee").

Where, as here, the fee request exceeds 25% of the common fund, the Court is instructed to apply the twelve *Johnson* factors. *See Elder*, 2025 WL 354513, at *6 (citing *Johnson v. Georgia Highway Exp., Inc.*, 488 F.2d 714, 717–19 (5th Cir. 1974)); *see also In re Home Depot Inc.*, 931 F.3d 1065, 1090 (11th Cir. 2019) (explaining that courts in the Eleventh Circuit apply the *Johnson* factors when analyzing the percentage method). They are:

> (1) the time and labor required; (2) the novelty and difficulty of the questions involved; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and the length of the professional relationship with the client; (12) awards in similar cases.

*Camden I*, 946 F.2d at 772 n.3 (citing *Johnson*, 488 F.2d at 717-19); *see also Pinon v. Daimler AG*, No. 1:18-CV-3984-MHC, 2021 WL 6285941, at 17-20 (N.D. Ga. Nov. 30, 2021). Keeping in mind its "obligation to serve as a fiduciary for the class plaintiffs," *Drazen*, 106 F.4 at 1328, the Court turns to the *Johnson* factors to evaluate the reasonableness of the requested fees. Several such factors are particularly relevant here: the time and labor required; the novelty and difficulty of the issues; the skill required to achieve settlement; the

experience and ability of the attorneys; the contingent nature of recovery; and the results obtained.

### 1. The Time and Labor Required and the Novelty and Difficulty of the Issues

This matter undoubtedly required substantial time and labor. Plaintiffs' counsel vigorously litigated this case since June 2023. (Doc. 49 ¶ 1.) After filing a complaint, the Court ordered the consolidation of seven related matters, and counsel refiled a consolidated class action complaint. (*Id.* ¶¶ 2–3.) Two motions to dismiss were filed. The parties engaged in mediation, (*id.* ¶¶ 4–9), which was at first unsuccessful, but ultimately led to an agreement. (Doc. 56-2.) Counsel subsequently petitioned the Court for preliminary approval of the settlement agreement, (Doc. 56), and worked with a settlement administrator to inform class members about their rights under the agreement. (Doc 69-2, Fenwick Decl.) Plaintiffs' counsel participated in two hearings and one status conference with the Court in connection with the settlement. Counsel's significant efforts support the requested fee award.

The Court further finds that this case involved novel and difficult legal issues. As a general matter, "[c]onsumer class action litigation is complex and difficult to prosecute." *In re Arby's Rest. Grp., Inc. Data Sec. Litig.*, 2019 WL 2720818, at *3. Data breach class actions, moreover, involve areas of federal

and state law that are rapidly evolving. *See id.* (stating that data breach litigation "involves the application of unsettled law with disparate outcomes across states and circuits" and that "Georgia law, in particular, presents challenges"). Such cases can be risky and difficult to litigate. *See Desue v. 20/20 Eye Care Network, Inc.*, No. 21-CIV-61275-RAR, at *8 (S.D. Fla. July 8, 2023) (collecting cases noting the risks involved in data breach class action litigation). The novelty and difficulty of the legal issues weigh in favor of the requested fee.

**2. The Skill Required to Litigate the Case; Counsel's Experience and Ability**

Litigation of this case required a high degree of skill and experience in consumer class action litigation. Class counsel are experienced and able class action litigators. Particularly relevant here, they are currently litigating dozens of data breach class actions in state and federal courts across the country. (Doc. 62-2, Toops Decl. ¶ 4.) Counsel's wealth of experience surely aided the prompt, fair, and reasonable settlement of this action. This factor weighs in favor of the requested fee.

**3. The Customary Fee; Whether the Fee is Fixed or Contingent**

As discussed above, a fee award of 33% of the common fund is well within the customary range for attorneys' fees in this kind of case. The Court also considers that Plaintiffs' counsel pursued this case on a contingency fee basis. "A contingency fee often justifies a larger award of attorneys' fees because, if the case is lost, an attorney realizes no return for investing large amounts of time and resources in the case." *Pinon*, 2021 WL 6285941, at *18; *see also In re Arby's Rest. Grp., Inc. Data Sec. Litig.*, 2019 WL 2720818, at *4 ("The risk of non-payment based upon the contingent nature of recovery in this case supports the requested award of attorneys' fees."). These considerations weigh in favor of the requested fee.

**4. The Amount Involved and the Results Obtained**

Class counsel obtained a significant award for class members. They successfully negotiated a $1,500,000 common fund settlement to address damages stemming from the Data Incident. In addition to identity theft protection services, class members are entitled to an award of money damages. Although a relatively small percentage of absent class members submitted claims, those who did so will be adequately compensated for their injuries. For example, 533 class members will receive an average of $68 each for lost time

spent responding to the Data Incident; 6 people will receive an average of $255 each for "ordinary expenses" incurred in relation to the Data Incident; and the 1,650 people who opted for alternative cash payments will receive approximately $402.48 each. The distribution of the common fund is set forth in the following table.

| **Distribution of $1.5 Million Common Fund** | |
|---|---|
| Claim Benefits for *Lost Time* | $36,214.00 (533 claims) |
| Claim Benefits for *Credit Monitoring* | $14,049.36 (1,501 claims) |
| Claim Benefits for *Ordinary Expenses* | $1,529.81 (6 claims) |
| Claim Benefits for *Extraordinary Expenses* | $8 (1 claim) |
| Attorneys' Fees, Costs, and Expenses | $500,000 |
| Service Awards to the Seven Class Representatives | $11,500 (total) |
| Costs of Notice and Administration | $272,613.16 |
| Amount Remaining for Alternative Cash Payment | $664,085.67<br><br>1,650 claims<br><br>Estimated Alternative Cash Payment Per Person ($664,085.67/1,650 Claims) = $402.48 |

Notably, the distribution plan leaves no reversion of funds to Defendant, as there will be a *cy pres* disbursement if any funds remain after checks are cashed. (*See* Settlement Agreement §§ 3.1.6-3.1.7.) The result achieved on behalf of the class weighs in favor of the proposed fee award.

In sum, the Court finds that the *Johnson* factors support an award of $500,000 in attorneys' fees and expenses, which shall be paid out of the common fund. The requested attorneys' fee and expense award is approved.

**E. Service Awards**

Plaintiffs seek service awards totaling $11,500 for the seven, named Plaintiffs. (Doc. 56-2 at 5.) The request is unopposed. The case before the Court is a diversity action. "'As this Court, and other courts in the Eleventh Circuit have explained, state law governs the issue of Service Awards in diversity actions,' and Georgia law allows for service awards to class representatives." *Elder*, 2025 WL 354513, at *8 (quoting *Tims v. LGE Cmty. Credit Union*, No. 1:15-cv-4279-TWT, 2023 WL 11915734, at *1 (N.D. Ga. Nov. 29, 2023)) (collecting cases).[4] The proposed total service award of $11,500 —

[4] In *Johnson v. NPAS Solutions*, 975 F.3d 1244 (11th Cir. 2020), the Eleventh Circuit considered the propriety of a $6,000 service award to the class representative in a case alleging violations of the Telephone Consumer Protection Act, 47 U.S.C. § 227. The Court vacated the award, holding that, under the Supreme Court's precedents in *Trustees v. Greenough*, 105 U.S. 527 (1882), and *Cent. R.R. & Banking Co. v. Pettus*, 113 U.S. 116 (1885), "[a]

$2,500 to Plaintiff Christina Cain and $1,500 to each other class representative — is a modest sum that raises no specter of conflicting interests or inadequate representation. Georgia courts have approved service awards in significantly higher amounts. *See, e.g., Vtal Real Est., LLC v. Mayor*, No. SPCV21-00789-CO 2023 Ga. Super. LEXIS 3230, at *15 (Ga. Super. Ct. Sept. 13, 2023) (approving a service award of $87,500 for the class representative to be paid from a common settlement fund of $3,500,000); *Anderson v. Chatham Cnty.*, No. SPVC21-01165-CO, 2024 Ga. Super. LEXIS 3210, at *15 (Ga. Super. Ct. Mar. 1, 2024) (approving a service award to the class representative in the amount of $18,750.00 from an aggregate fund of $750,000). Additionally, the award is tailored to reflect the degree to which each representative participated in the litigation, and it reasonably compensates class representatives for their service. The requested service awards are approved.

---

plaintiff suing on behalf of a class . . . cannot be paid a salary or be reimbursed for his personal expenses." *Johnson*, 975 F.3d at 1257. *Johnson*, however, involved a claim brought under a federal statute, whereas the instant case involves only state-law claims. The Court thus applies Georgia law regarding service awards. *Tims*, 2023 WL 11915734, at *1; *see also Arnold v. State Farm Fire & Cas. Co.*, No. 2:17-CV-148-TFM-C, 2023 WL 7308098, at *1 (S.D. Ala. Nov. 6, 2023) ("The Court agrees with its several sister courts in this Circuit that *Johnson v. NPAS Solutions, LLC*, 975 F.3d 1244 (11th Cir. 2020), is inapplicable in diversity jurisdiction cases where the underlying claims arise under state law."); *Venerus v. Avis Budget Car Rental, LLC*, 674 F. Supp. 3d 1107, 1110 (M.D. Fla. 2023) (same).

## III. Conclusion

For the foregoing reasons, the Court **ORDERS** as follows:

(1) The Court **CERTIFIES** the Settlement Class pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(3), and 23(e).

(2) The Court **CONFIRMS** the appointment of Cohen & Malad, LLP and Peiffer Wolf Carr Kane Conway & Wise, LLP as Class Counsel.

(3) The Court **GRANTS** final approval to the appointment of Plaintiffs Christina Cain, Darron Danna, Stephanie Youngblood, Joshua Wolf, Kim White, Brandon Guerra, and Charles Williams, as the Class Representatives.

(4) The Court **CONFIRMS** that class notice satisfied the requirements of due process, Federal Rule of Civil Procedure 23, and all other legal requirements.

(5) The Court **GRANTS** Plaintiffs' Unopposed Motion for Final Approval of Class Action Settlement, (Doc. 69), pursuant to Federal Rule of Civil Procedure 23(e)(2). The Court directs the parties, their attorneys, and the Claims Administrator to consummate the settlement in accordance with this order and the terms of the Settlement Agreement.

(6) The Court **GRANTS** Plaintiffs' Motion for Attorneys' Fees and Expenses, (Doc. 62), and **AWARDS** attorneys' fees and expenses in the amount of $500,000.

(7) The Court **GRANTS** Plaintiffs' Motion for Class Representatives' Service Awards, (Doc. 63), and **AWARDS** $2,500 to Plaintiff Christina Cain, $1,500 to Plaintiff Darron Danna, $1,500 to Plaintiff Stephanie Youngblood, $1,500 to Plaintiff Joshua Wolf, $1,500 to Plaintiff Kim White, $1,500 to Plaintiff Brandon Guerra, and $1,500 to Plaintiff Charles Williams.

(8) The Court **OVERRULES** the single objection to the Settlement Agreement. (Doc. 66).

(9) The Court hereby **DISCHARGES** the Released Claims as to the Released Persons and Released Entities, as those terms are used and defined in the Settlement Agreement. (Doc. 56-2 at 2-4, 14-15.) Released Claims shall not include the claims of the five individuals who have timely and validly requested exclusion from the Settlement Class. (Doc. 69-2 at 6, 36.)

(10) The Court hereby **DISMISSES** this action **WITH PREJUDICE** and without costs.

(11) The Court retains exclusive and continuing jurisdiction with respect to implementation and enforcement of the terms of the Settlement Agreement.

The Clerk is directed to enter a separate judgment consistent with the terms of this order pursuant to Fed. R. Civ. P. 58.

**SO ORDERED** this 10th day of March, 2025.

SARAH E. GERAGHTY
United States District Judge